**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

```
--------------------------------------------------
STARTRAK SYSTEMS, LLC,                  :
                                        :
                  Plaintiff,            :          Civ. No. 07-3203 (DRD)
                                        :
            v.                          :
                                        :
BRIAN HESTER, SATAMATICS LTD.,          :              O P I N I O N
SATAMATICS, INC., AND FARRUKH           :
SHAHZAD,                                :
                                        :
                  Defendants.           :
                                        :
--------------------------------------------------
```

CARROLL, McNULTY & KULL L.L.C.
Matthew J. Lodge, Esq.
Caroline L. Crichton, Esq.
120 Mountain View Boulevard
P.O. Box 650
Basking Ridge, New Jersey 07920

*Attorneys for Plaintiff*


CAMMARATA, NULTY & GARRIGAN LLC
John P. Nulty, Jr., Esq.
Michael S. Doran, Esq.
850 Bergen Avenue
Jersey City, NJ 07306

STEPTOE & JOHNSON LLP
Alfred M. Mamlet, Esq.
Roger W. Parkhurst, Esq.
Susan Koegel, Esq.
Gretchen P. Miller, Esq.
1330 Connecticut Ave., NW
Washington, DC 20036

1

*Attorneys for Defendants*

**DEBEVOISE, Senior District Judge**

## I. <u>PROCEDURAL HISTORY</u>

This matter comes before the court on plaintiff, StarTrak Systems, LLC's ("Plaintiff" or "StarTrak") application by order to show cause why a preliminary injunction should not issue against Defendants Brian Hester ("Hester"), Satamatics Ltd. and Satamatics Inc. ("Satamatics"), and Farrukh Shahzad ("Shahzad") (the "Defendants"). The application seeks, *inter alia*, to enjoin Defendants "from the disclosure or use of StarTrak's trade secrets and precluding the Defendants from any involvement in selling or marketing their product, ReeferMatics." (Pl.'s Br. 3).

Plaintiff's complaint, filed on July 11, 2007, alleges the following: Count One- civil contempt against all defendants; Count Two- misappropriation of trade secrets against all defendants; and Count Three- breach of contract against Shahzad (the "Complaint"). In addition to Plaintiff's application, Defendants move to: (1) dismiss the Complaint for lack of subject matter jurisdiction and lack of personal jurisdiction over Satamatics and Shahzad; and (2) strike portions of the affidavit of Thomas Robinson ("Robinson"), StarTrak's Executive Vice President. For the reasons stated below, all three applications will be denied.

## II. <u>BACKGROUND</u>

### A.    <u>The Parties</u>

#### 1. <u>StarTrak</u>

Since 1998, StarTrak, based in Morris Plains, New Jersey, has been a leader in providing intelligent wireless monitoring and control solutions for the refrigerated transport, railroad, and specialty freight industries.  (Affidavit of Thomas Robinson[1] ("Robinson Aff.") ¶ 7).  In developing its product line over the years, StarTrak has developed significant intellectual property and trade secrets.  (Id. at ¶ 10).

## 2.  Hester

Hester, President and Chief Operating Officer of Satamatics, is a former Vice President of Sales at StarTrak from 1997 to 2000.  (Declaration of Brian Hester ("Hester Decl.") ¶¶ 6-7). During his employment, Hester resided in Maryland and frequently worked at StarTrak's headquarters in Morris Plains, New Jersey.  (Robinson Aff. ¶ 19).  In March 2000, Hester resigned, demanded a share of equity and commenced a lawsuit against StarTrak in this court.[2] (Id. at ¶ 20).  During the lawsuit, StarTrak uncovered evidence that, prior to his resignation, Hester downloaded confidential and proprietary information.  (Id.).  The lawsuit settled and the parties signed a consent order of permanent injunction (the "Consent Order").  The Consent Order, dated November 5, 2000, *inter alia*, permanently restrained Hester, "his agents, servants, employer and attorneys, and all those in active concert or participation with them . . . from making any present or future use or disclosure of any and all confidential and/or proprietary information of StarTrak . . . ."  (Robinson Aff. Ex. A).

After leaving StarTrak, between 2001 and 2003, Hester was employed by Comtech

---

[1]Thomas Robinson is the Executive Vice President of StarTrak.  (Robinson Aff. ¶ 1).

[2]The case was docketed 00-2759 (AJL).

Mobile ("Comtech"), a company that provides various satellite communications equipment deployed in commercial and government applications around the world.  (Hester Decl. ¶ 18). While Hester was an employee, Comtech considered selling a product to compete with StarTrak's monitoring product, ReeferTrak.  Thereafter, Comtech decided to stop developing the competing product.  (Hester Decl. ¶ 19; Robinson Aff. ¶ 25).  The existence of the Consent Order was one of the factors that led to this decision.  (OSC Hr'g Tr. Vol. 1[3] 140:7-142:4).  In February 2003, Hester began working for Satamatics.  (Hester Decl. ¶ 25).  His role at Satamatics is the marketing of a D+ network and satellite terminals and selling the terminals and wireless airtime to end-users and distributors in the United States, Canada, and Mexico.  (Id.).

### 3.  Shahzad

Shahzad, Senior Application Engineer at Satamatics, was a Senior Software Engineer at StarTrak from 1997-2003.  (Declaration of Farrukh Shahzad ("Shahzad Decl.") ¶ 8).  At StarTrak, Shahzad's responsibilities included designing and implementing the 2-way satellite, cellular and radio-frequency communication based remote asset monitoring systems.  (Id.).  In August 2000, Shahzad signed a confidentiality agreement as a condition of his employment (the "Confidentiality Agreement").  (Id. at ¶ 13; Robinson Aff. ¶ 28).  The Confidentiality Agreement, *inter alia*, prohibited Shahzad from disclosing confidential information both during and after his employment.  (Robinson Aff. Ex. B).  In October 2003, Shahzad joined Satamatics.  (Shahzad Decl. ¶ 5).  Throughout his employment with StarTrak, Shahzad resided in New Jersey and worked primarily out of StarTrak's offices in Morris Plains, New Jersey.  (Robinson Aff. ¶ 33).

---

[3]Transcript from August 16, 2007 hearing on Order to Show Cause.

4. <u>Satamatics</u>

Satamatics Global Ltd. is the parent company of both Defendant Satamatics Ltd. and

Satamatics, Inc.  (Declaration of Peter Chisholm[4] ("Chisholm Decl.") ¶ 1).  The primary business

of Satamatics is to design, develop, manufacture and sell D+ terminals, network components, and

telecommunications services ("airtime" or "services").  (<u>Id.</u> at ¶ 11).  Satamatics operates on a

network of satellites owned by Inmarsat plc ("Inmarsat"), a UK-based satellite company.  (<u>Id.</u>).

B.   **The Products**

1. <u>ReeferTrak</u>

StarTrak's product, ReeferTrak[5], is marketed to the refrigerated transport market.

(Robinson Aff. ¶ 38).  The "StarTrak On-Asset Device" attaches to a "reefer unit"[6] (device which

refrigerates a reefer) and reads data from a "reefer micro" (microprocessor that controls operation

of reefer and records and stores data).  (<u>Id.</u> at ¶ 39).  The On-Asset Device communicates

information (such as temperature, mode of operation, engine hours, GPS location, door status,

fuel level, alarms or events, etc.) via satellite to StarTrak's web-based network/server.  (<u>Id.</u> at ¶

39-40).   StarTrak customers have access to the network and can receive status reports on their

reefers.  (<u>Id.</u> at ¶ 40).  ReeferTrak can also send commands to the On-Asset Device.  (<u>Id.</u> at ¶ 41).

_____

[4]Peter Chisholm is the CEO of Satamatics Global Ltd., Satamatics Ltd., and Satamatics, Inc.  (Chisholm Decl. ¶ 1).

[5]The word "reefer" is the industry term for refrigerated transport trailers, containers or rail cars.  (Robinson Aff. ¶ 38).  Most reefers are manufactured by two companies- Thermo King and Carrier Corporation ("Carrier").  (OSC Hr'g Tr. Vol. 1 52:10-52:14).

[6]The reefer unit typically runs on a diesel engine which is attached to the reefer and requires a fuel tank.  (OSC Hr'g Tr. Vol. 1 52:3-52:9).

StarTrak uses the a satellite system owned by Mobile Satellite Ventures, which provides a communications link to a partner company called Transcore.  (OSC Hr'g Tr. Vol. 1 58:9-58:14). Transcore builds the modem that StarTrak uses and provides the communication link to StarTrak.  (Id. at 58:14-58:15).  StarTrak buys the modem for an agreed hardware price and pays a monthly charge for the service, depending on the amount of data that it sends through the network.  (Id. at 58:17-58:22).  The modem is housed in the same "box" as the On-Asset Device. (Id. at 58:23-59:13).

StarTrak claims that it has developed two critical trade secrets as a result of the fact that "high-bandwidth" communications systems are not commercially available.   (Robinson Aff. ¶ 44).  StarTrak had to develop a cost-effective product using "low-bandwidth" or "narrow-bandwidth" systems- systems that are only capable of transmitting a limited amount of information at a time.  (Id. at ¶ 45-46).  The first trade secret, "Data Compression/Delivery Capability" allows StarTrak to compress and deliver large amounts of data from the reefer using a "compression algorithm."  (Id. at ¶ 48-50).  Second, ReeferTrak uses "intelligent firmware"[7] to process hundreds of data inputs and decide whether to communicate a message.  (Id. at ¶ 52).

For example, the On-Asset Device has the ability to read "alarms" that the device measures directly regarding the reefer's battery voltage.  (Id. at ¶ 53).  Because during a reefer's normal operation battery voltage fluctuates, it is not always appropriate to communicate a battery

---

[7]"Firmware" has been defined as another name for software that resides on an appliance mounted remotely.  ReeferTrak's firmware is found in the On-Asset Device.  (Id. at ¶ 52). "Firmware" has also been described as "anything written on an embedded software device" and "software code that tells the device to do what it's supposed to do."   (OSC Hr'g Tr. Vol. 1 49:4-21).

alarm to customers during the fluctuations. (Id.). Accordingly, StarTrak structured the firmware so that it can evaluate the alarms and determine when it is appropriate to communicate an alarm via satellite to StarTrak's server.[8] (Id.). Another example, "Rapid Fuel Loss" functionality, is intended to send a notification to customers when a reefer's fuel levels abruptly change. (Id. at ¶ 55). Because fuel gauges on the reefer often reflect inaccurate fuel levels, and to account for fluctuations and provide customers with an accurate fuel loss notification, StarTrak created ReeferTrak's firmware so that it has the ability to discern fuel measurement anomalies caused by ordinary movement of the reefers from material and abrupt changes that warrant sending an alarm to the customer. (Id.).[9] StarTrak claims that it expended in excess of $10 million in developing and refining these trade secrets. (Id. at ¶ 57).

## 2. Reefermatics

"Reefermatics" is the name of the product that Satamatics offers to the refrigerated transport industry. (Chisholm Decl. ¶ 35). As indicated above, the primary business of Satamatics is to design, develop, manufacture D+ terminals and to sell D+ terminals, D+ airtime, and applications directly to end-users and indirectly through distributors and value-added resellers ("VARs"[10]). (Id. at ¶ 11, 21). The D+ service is a tracking, monitoring, and control

---

[8]Robinson states that it is impossible to create firmware for a reefer application that can perform this functionality without considerable trial and error and that it took StarTrak and Shahzad three years to properly refine the conditions under which it would be appropriate to send a battery voltage alarm notification. (Id. at ¶ 54).

[9]Robinson states that Shahzad was instrumental in creating this capability, which took nearly six months to refine. (Id.).

[10]A VAR is typically a distributor who develops an application and resells Satamatics terminals and airtime for use with the application. (Id. at ¶ 20). StarTrak is an example of a

service and is a very short message service.  (Id. at ¶ 12-13).  The message size is 84 bits, which

is displayed as 84 "1"s and /or "0"s.  (Id. at ¶ 13).  The D+ service works as follows: (1) a

microprocessor attaches to the asset, e.g., a cargo container, ship, or truck; (2) the microprocessor

communicates to the D+ terminal; (3) the D+ terminal communicates to a satellite (here,

Inmarsat); (4) the communication is transmitted from the satellite to the Land Earth Station

where the raw data is collected and sent to a data center for processing; and (5) the information is

transmitted to the end-user/customer.  (Declaration of John Hatherall[11] ("Hatherall Decl.") ¶

6(b)).  The D+ terminals include a script-promptable application processor ("MSP") which is

interfaced with the D+ firmware embedded in the D+ terminal which interfaces with the

microprocessor.  (Id. at ¶ 6(f)).  A "script" is a sequence that can be used by the customer to

prompt the terminal when to read data and what data to read from the microprocessor.  (Id. at ¶

6(g)).  Each script is limited to 32 operations.[12]  (Hatherall Decl. ¶ 6(g)).  Through these

operations, data is received from the microprocessor and assembled into an 84 bit[13] packet ready

for transmission.   (Id. at ¶ 6(h)).

       Satamatics has designed, developed, and manufactured two generations of D+ satellite

terminal- SAT-101 and SAT-201.  (Chisholm Decl. ¶ 24).  Satamatics third generation terminal,

VAR; StarTrak does not manufacture its own terminals.  (Id.; OSC Hr'g Tr. Vol. 2 108:14-
108:22).  "Vol. 2" is the transcript from August 17, 2007.

       [11]John Hatherall is the Engineering Director of Satamatics Ltd.  (Hatherall Decl. ¶ 2).

       [12]Shahzad used the following analogy to describe the difference between "firmware" and
"scripts": Reefermatics firmware is like Windows Operating System- it does not include
operations but is capable of reasoning applications; scripts are like Microsoft Word in that scripts
are applications.  (OSC Hr'g Tr. Vol. 2 5:10-6:16).

       [13]A bit is a single binary digit taking the value of either a "1" or a "0."   (Id. at ¶ 6(h)).

SAT-301, is scheduled to be released in the next twelve months.  (Id.).  There are more than

120,000 D+ terminals using the D+ network.  (Id. at ¶ 25).  Satamatics intentionally designed its

technology program so that subsequent changes would be variations of what has been done

before so that new applications could be developed rapidly.  (Id. at ¶ 27).  Although Satamatics

typically develops very few variants of firmware, which requires significant time, Satamatics will

typically develop hundreds of scripts and help its customers develop hundreds more for a new

application.  (Id.).  The applications processor included in the terminals processes simple scripts

to control the terminal, and the "scripting environment" allows the applications developer to

program the terminal to perform a variety of functions, read sensors, and provide remote control.

(Id. at ¶ 28).  The time frame for development is as follows: firmware- 3 months from concept to

product launch; script- 2-4 weeks from concept to product launch; software web-based

application- 1-4 months from concept to product launch.  (Id. at ¶ 29).  Chisholm claims that

Satamatics can achieve these short timescales because the firmware modifications are modest,

and because most scripts and web-based applications are based on previous Satamatics firmware,

scripts, and applications.  (Id.).

      Satamatics decided to develop Reefermatics in 2006 because: (1) of the growing market

for the monitoring of refrigerated trailers; (2) Carrier provided a new protocol[14] for

communicating with the micro in the Carrier refrigerated trailer to Satamatics (the "Carrier

---

[14]A protocol is the way in which two pieces of equipment communicate.  For example, a
printer driver is a protocol which allows a printer to communicate with a PC.  In the present
context, an example of a protocol is the language by which the satellite modem or terminal
communicates over the satellite and back to the earth station.  Most vendors have their own
protocols.  Satamatics' protocol is currently called D+.  (OSC Hr'g Tr. Vol. 1 98:5-98:24).

Third-Party Protocol"); and (3) potential customers told Satamatics that they wanted a competitive alternative to StarTrak.  (Id. at ¶ 36).  Reefermatics is a combination of three primary components: (1) the satellite terminal (SAT-201) together with its firmware and computer script interfaces to the micro on the reefer; (2) the Satamatics D+ satellite network; and (3) the internet application itself.  (Id. at ¶ 37).

Satamatics licensed the Carrier Third-Party Protocol to enable the Satamatics terminal to communicate with the micro on the Carrier reefer.[15]  (Chisholm Decl. at ¶ 38).  Chisholm states that the Carrier Third-Party Protocol provides a method for the Satamatics terminal to communicate with the micro to obtain this data and that the Protocol made entry with Reefermatics relatively easily.[16]  (Id. at ¶ 39).  Reefermatics can only be used by Carrier-cooled mobile refrigerated units that are compatible with the Carrier Third-Party Protocol.  (Hatherall Decl. ¶ 31).

## III.  DISCUSSION

### A.  Motion to Dismiss

#### 1.  Subject Matter Jurisdiction

In contrast to a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) where the court must accept all allegations as true, on a motion to dismiss for lack of

_____

[15]Currently, the Carrier Third-Party Protocol is a one-way protocol, meaning that it permits transfer of data only from the Carrier micro to the Reefermatics terminal.  (Hatherall Decl. ¶ 31).

[16]Hatherall characterizes the implementation of an interface to the Carrier Third-Party Protocol such as the one developed for Reefermatics as "a relatively trivial task."  (Hatherall Decl. ¶ 34).

subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." <u>Mortensen v. First Fed. Sav. & Loan Ass'n</u>, 549 F.2d 884, 891 (3d Cir. 1977).  The court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." <u>Int'l Ass'n of Machinists & Aerospace Workers v. Nw. Airlines, Inc.</u>, 673 F.2d 700, 711 (3d Cir. 1982).  Additionally, Plaintiff has "the burden of proof that jurisdiction does in fact exist."  549 F.2d at 891.

Defendants contend, both in their opposition to Plaintiff's order to show cause and their motion to dismiss, that the court lacks subject matter jurisdiction over defendants Satamatics Ltd, Satamatics Inc., and Farrukh Shahzad.  The parties agree that the court does not have original jurisdiction over Count II (misappropriation of trade secrets against all Defendants) or Count III (breach of contract against Shahzad).  Thus, subject matter jurisdiction depends on the court's subject matter jurisdiction over Count I (civil contempt against all Defendants).

Count I alleges that Hester, acting in concert with Satamatics, Inc., Satamatics, Ltd., and Shahzad, violated the Consent Order between Hester and StarTrak..  The Consent Order, *inter alia*, permanently restrained and enjoined Hester, "his agents, servants, employer and attorneys, and all those in active concert or participation with them . . . from making any present or future use or disclosure of any and all confidential and/or proprietary information of StarTrak . . . ."

Defendants contend that Satamatics and Shahzad were not parties to the prior action and lacked actual notice of the Consent Order until June or July of this year.  Additionally, Satamatics and Shahzad contend that they were not in privity with Hester when the Consent

Order was issued.  They argue that "[u]nder Rule 65(d), the persons bound by an injunctive order are only those persons in privity with the parties to the action in which the injunctive order issued."  (Defs.' Br. in Supp. of Mot. for Summ. J. 7).  They contend that none of the Satamatics Defendants "participated in the prior action, and no interests of any of the Satamatics Defendants were aligned with the interests of Mr. Hester, whose primary interest was in getting compensation for StarTrak's alleged breach of his employment contract."  (Id. at 8).

Defendants also contend that Plaintiff has no basis for asserting supplemental jurisdiction.  Defendants contend that 28 U.S.C. § 1367(a) requires that the state law claim arise from the case or controversy which involved the federal district court's original subject matter jurisdiction and that state law claims that do not arise from that same case or controversy do not invoke this court's supplemental jurisdiction.  Defendants argue that here, the court's original jurisdiction is based on the 2000 Consent Order, which arose out of Hester's claim for compensation.

However, Plaintiff correctly points out that even if the court does not have original jurisdiction over Satamatics and Shahzad with respect to Count I, the court has supplemental jurisdiction over Satamatics and Shahzad and Counts II and III.  There are three requirements that must be satisfied before this court may exercise supplemental jurisdiction: (1) the court must have subject matter jurisdiction over the federal claim; (2) the state and federal claims must derive from a common nucleus of operative facts; and (3) the claims must be such that they would ordinarily be expected to be tried in one judicial proceeding.  MCI Telecomms. Corp. v. Teleconcepts, Inc., 71 F.3d 1086, 1102 (3d Cir. 1995).

12

Plaintiff correctly states that the court's jurisdiction in this matter to enforce the Consent Order is not based on its jurisdiction over Hester's prior action, but rather, the court has original jurisdiction to enforce the Consent Order because that power is inherent in the court's authority. Nat'l R.R. Passenger Corp. v. Pennsylvania Public Utility Comm'n, 342 F.3d 242, 259 (3d Cir. 2003) ("[A] federal district court has authority to enforce its consent decrees . . . ."); RoadTechs, Inc. v. MJ Highway Tech., Ltd., 83 F. Supp. 2d 677, 685 (E.D. Va. 2000) ("It has long been recognized that federal courts have inherent jurisdiction to protect and enforce their orders and judgments.").

Thus, the issue is not whether Counts II and III in this action form part of the same case or controversy as Hester's prior action. Rather, the issue is whether Counts II and III are so related to the Defendants' alleged violation of the Consent Order that they form the same case or controversy. The court finds that they are. All of the Counts in the Complaint relate to the alleged disclosure and/or use of confidential information and the subsequent development of a competing product.

Here, because it is clear that: (1) the court has subject matter jurisdiction over Count I; (2) all of Plaintiff's claims derive from a common nucleus of common fact; and (3) the claims would ordinarily be expected to be tried in one judicial proceeding, the court may properly exercise supplemental jurisdiction.

## 2. Personal Jurisdiction

"A federal court sitting in New Jersey has jurisdiction over parties to the extent provided under New Jersey state law." Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 96 (3d Cir. 2004).

13

Under New Jersey's long-arm statute, jurisdiction is coextensive with the due process

requirements of the United States Constitution.  Id.  "Personal jurisdiction under the Due Process

Clause depends upon 'the relationship among the defendant, the forum, and the litigation.'" IMO

Indus., Inc. v. Kiekert AG, 155 F.3d 254, 259 (3d Cir. 1998) (quoting Shaffer v. Heitner, 433

U.S. 186, 204 (1977)).

> Physical presence within the forum is not required to establish
> personal jurisdiction over a nonresident defendant.  Instead, the
> plaintiff must show that the defendant has purposefully directed its
> activities toward the residents of the forum state, or otherwise
> 'purposefully avail[ed] itself of the privilege of conducting activities
> within the forum State, thus invoking the benefits and protections of
> its laws.'  Where . . . the plaintiff's cause of action is related to or
> arises out of the defendant's contacts with the forum, the court is said
> to exercise 'specific jurisdiction.'  In order for specific jurisdiction to
> be properly exercised under the Due Process Clause, the plaintiff
> must satisfy a two-part test.  First, the plaintiff must show that the
> defendant has constitutionally sufficient 'minimum contacts' with the
> forum.  Second, for jurisdiction to be exercised the court must
> determine, in its discretion, 'that to do so would comport with
> "traditional motions of fair play and substantial justice."'[17]

Id. (citations omitted).

On a motion to dismiss for lack of personal jurisdiction, it is plaintiff's burden to

establish the court's jurisdiction over a defendant.  Miller Yacht Sales, 384 F.3d at 97.

"However, when the court does not hold an evidentiary hearing on the motion to dismiss, the

plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled

to have its allegations taken as true and all factual disputes drawn in its favor."  Id.

---

[17]Because Plaintiff does not argue that the court has general jurisdiction, the court's
analysis will be confined to court's exercise of specific jurisdiction.

14

In determining personal jurisdiction with respect to a breach of contract claim, the court "must consider the totality of the circumstances, including the location and character of the contract negotiations, the terms of the contract, and the parties' actual course of dealing. Remick v. Manfredy, 238 F.3d 248, 256 (3d Cir. 2001).

As for intentional torts, "an intentional tort directed at the plaintiff and having sufficient impact upon it in the forum may suffice to enhance otherwise insufficient contacts with the forum such that the 'minimum contacts' prong of the Due Process test is satisfied." IMO Indus., 155 F.3d at 260. Under the "effects test" set forth in Calder v. Jones, 465 U.S. 783 (1984), "a court may exercise personal jurisdiction over a nonresident defendant who commits an intentional tort by certain acts outside the forum which have a particular type of effect upon the plaintiff within the forum." 155 F.3d at 261. The "effects test" requires that the plaintiff establish:

> (1) The defendant committed an intentional tort;
>
> (2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort;
>
> (3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

Id. at 265-66. However, "[s]imply asserting that the defendant knew that the plaintiff's principal place of business was located in the forum would be insufficient in itself to meet this requirement." Id. at 265.

Defendants contend that Plaintiff's claims against Satamatics and Shahzad must be dismissed for lack of personal jurisdiction. Their only argument is that "[t]he Complaint here

fails to plead, and Plaintiff's Motion fails to provide, any basis upon which this Court should exercise personal jurisdiction over each of Satamatics Ltd., a British corporation, Satamatics Inc., a Delaware corporation, or Mr. Shahzad, a resident of Texas." (Defs.' Br. in Supp. of Mot. for Summ. J. 10).

Plaintiff responds that it has sufficiently pleaded facts to support the court's exercise of personal jurisdiction: (1) throughout his employment, Shahzad resided in N.J. and worked out of its N.J. office; (2) while working in N.J., Shahzad acquired knowledge of trade secrets that he later disclosed to Satamatics; (3) Satamatics has been directly involved in the improper use of StarTrak's confidential and proprietary information; and (4) Defendants' misappropriation of trade secrets caused harm to StarTrak in N.J. These representations are uncontested by Defendants.

The court finds that given Plaintiff's uncontested representations, Satamatics and Shahzad have sufficient minimum contacts with New Jersey to establish personal jurisdiction such that it comports with traditional notions of fair play and substantial justice.

**B.    <u>Motion to Strike</u>**

Defendants also seek to strike portions of the affidavit of Thomas Robinson. They argue that the affidavit should be stricken because it is hearsay, lacks foundation, and is merely conclusory. (Defs.' Br. in Supp. of Mot. to Strike 2). Additionally, Defendants contend that Robinson does not have personal knowledge of the alleged facts in the affidavit. (<u>Id.</u>).

However, as Plaintiff points out, a court may properly rely on affidavits and hearsay materials in considering a motion for a preliminary injunction. Plaintiff relies on <u>Kos Pharm.,</u>

16

Inc. v. Andrx Corp., 369 F.3d 700 (3d Cir. 2004) in support of this proposition.  The <u>Kos</u> court

stated:

>It is well established that "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). In keeping with this principle, many of our sister Circuits have recognized that "[a]ffidavits and other hearsay materials are often received in preliminary injunction proceedings." *Asseo v. Pan Am. Grain Co.,* 805 F.2d 23, 26 (1st Cir.1986); *see also Ty, Inc. v. GMA Accessories, Inc.,* 132 F.3d 1167, 1171 (7th Cir.1997) (citing *Asseo* ); *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.,* 51 F.3d 982, 985 (11th Cir.1995) ("At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction...."); *Sierra Club, Lone Star Chapter v. FDIC,* 992 F.2d 545, 551 (5th Cir.1993) (courts at preliminary injunction stage "may rely on otherwise inadmissible evidence, including hearsay"); *Flynt Distrib. Co. v. Harvey,* 734 F.2d 1389, 1394 (9th Cir.1984) ("The urgency of obtaining a preliminary injunction ... makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may even give inadmissible evidence some weight ...."); *cf. Heideman v. South Salt Lake City,* 348 F.3d 1182, 1188 (10th Cir.2003) ("The Federal Rules of Evidence do not apply to preliminary injunction hearings.").

>These cases are consistent with the lack of any rule in the preliminary injunction context akin to the strict rules governing the form of affidavits that may be considered in summary judgment proceedings. *Compare* Fed.R.Civ.P. 56(e) (affidavits on summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein") *with* Fed.R.Civ.P. 65 (no similar provision in rule governing preliminary injunctions). *See also* 11A Charles Alan Wright et al., *Federal Practice & Procedure* § 2949 (2d ed. 1995) ("[A] consideration of the different policies that underlie Rules 56 and 65 indicates [that the Rule 56(e) standard] should not be imposed on applications under the latter rule.").

> District courts must exercise their discretion in "weighing all the
> attendant factors, including the need for expedition," to assess
> whether, and to what extent, affidavits or other hearsay materials are
> "appropriate given the character and objectives of the injunctive
> proceeding." *Asseo,* 805 F.2d at 26. The weight to which such
> materials are entitled may of course vary greatly depending on the
> facts and circumstances of a given case.

Id. at 718-719.  Given the nature of this proceeding, the court will not strike the affidavit of Thomas

Robinson.  Instead, the court will exercise its discretion in determining the weight given to each

affiant in this matter.

**C.     Preliminary Injunction**

A preliminary injunction "is 'an extraordinary remedy, which should be granted only in

limited circumstances.'" Novartis Consumer Health, Inc. v. Johnson & Johnson, 290 F.3d 578,

586 (3d Cir. 2002) (quoting Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 800

(3d Cir. 1989)).  "[T]he movant, *by a clear showing*, carries the burden of persuasion."  Mazurek

v. Armstrong, 520 U.S. 968, 972 (1997).

> To obtain an injunction, [a movant must] demonstrate (1) that [it is] reasonably likely to
> prevail eventually in the litigation and (2) that [it is] likely to suffer irreparable injury
> without relief.  If these two threshold showings are made the District Court then
> considers, to the extent relevant, (3) whether an injunction would harm [the non-movant]
> more than denying relief would harm the [movant] and (4) whether granting relief would
> serve the public interest.

Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly, 309 F.3d 144, 157 (3d Cir. 2002).

With respect to the second factor, "[t]o obtain injunctive relief, a party must make a clear

showing of 'immediate irreparable injury' or a 'presently existing actual threat.'"

Marsellis-Warner Corp. v. Rabens, 51 F. Supp. 2d 508, 528 (D.N.J. 1999) (quoting Acierno v.

New Castle County, 40 F.3d 645, 655 (3d Cir. 1994)).  "The mere risk of irreparable[18] harm or

the possibility of a remote future injury is not enough."  Id.  The movant "must demonstrate that,

absent the issuance of a preliminary injunction, it will suffer harm which cannot be redressed

sufficiently following a trial of the matter."  Id.  Specifically, "where money damages are

'capable of ascertainment and award at final judgment . . . [and] will fully compensate [the

plaintiff] for its losses[,]' a preliminary injunction should not issue."  Id. (alteration in original)

(quoting Instant Air, 882 F.2d at 801).

StarTrak contends that it is entitled to a preliminary injunction as to its trade secrets for

several reasons.  StarTrak contends that Robinson's affidavit shows that: (1) its trade secrets are

unknown to its competitors; (2) its employees are subject to non-disclosure agreements; (3) apart

from Satamatics, StarTrak has been the only company to use such trade secrets in the refrigerated

transport market; (4) other companies have tried and failed to put competing products on the

market; (5) StarTrak has not disclosed its trade secrets; (6) StarTrak has been vigilant in

safeguarding its trade secrets; (7) the trade secrets are vital to its business, generally unknown in

the industry, enable StarTrak to offer its services at competitive prices and enjoy its status as the

leader in the market; (8) StarTrak expended in excess of $10 million in developing its trade

secrets; and (9) burden rests with Defendants to prove that they could have reverse engineered

ReeferTrak in nine months without misappropriating StarTrak's trade secrets.

Satamatics claims that Reefermatics is "nothing more than the latest of a dozen

applications that Satamatics, Ltd. has designed, developed and marketed to serve different

---

[18]"The word irreparable 'connotes "that which cannot be repaired, retrieved, put down
again [or] atoned for."''"  Id. (alteration in original).

industries requiring remote monitoring and tracking of mobile 'assets' such as refrigerated trailers." (Defs.' Br. 16).

As for StarTrak's two trade secrets, Defendants contend that the first, compression, is not used by Satamatics. They contend that the SAT-201 terminal does not compress data for Reefermatics and that it is not possible to do so because each and every "1" and "0" is required in the application. (Chisholm Decl. ¶ 49). They contend that one of their competitive advantages is that they use the 84 bits as efficiently as possible to communicate with the remote terminal; since the internet application knows what each bit means, it can display the customer friendly info. (Id.). They claim that StarTrak may need to compress data if they actually send the data, e.g., temperature readings, but that Satamatics sends 1s and 0s to represent the data. (Id.).

Defendants contend that StarTrak's second trade secret, "intelligent firmware" is quite different from Satamatics firmware. They contend that the Satamatics firmware was first developed for the ITA-100 in 2002 and used with modest modifications in the SAT-101 and SAT-201 terminals, was modified in 2004 and 2005, and it took only a week to make modifications to implement the Reefermatics application. Defendants also contend that the architecture of the StarTrak and Satamatics solutions are different- (1) StarTrak processes its applications on its firmware; (2) StarTrak firmware is too big to fit inside the Satamatics terminal; (3) Satamatics applications, including Reefermatics, are driven by scripts and not by "intelligent firmware."

StarTrak, in its reply brief, contends that ReeferTrak and Reefermatics are not materially different products and attempts to refute each of the eight differences that Defendants argued in their brief. First, StarTrak contends that whether one or two boxes (StarTrak- uses Transcore

terminal and StarTrak interface box; Reefermatics- uses Satamatics terminal), the functionality remains the same.  Second, StarTrak contends that its claims are not premised on *how* Satamatics implemented its Reefermatics application, i.e., through firmware or scripts, but instead, are based Satamatics misappropriation of the trade secrets necessary to create a product that duplicates ReeferTrak's functionality.  Third, StarTrak claims that Defendants' contention that it uses "data reduction" instead of "data compression" is pure semantics and that both systems use the same solution to solve the same problem, i,e, the narrow bandwidth of the satellite communications networks.  Fourth, StarTrak claims that Reefermatics limited storage space does not affect the majority of its functionality.  Fifth, Startrak contends that the fact that it uses a terminal and third-party network (Transcore) and Reefermatics uses the Satamatics terminal and network is irrelevant.  Sixth, StarTrak contends that the communications protocol, whether CDMA or TDMA, does not have any bearing on the underlying software, firmware, or scripts that comprise the intelligence of the monitoring device.  Seventh, StarTrak contends that the fact that Reefermatics uses Carrier's new Third-Party Protocol instead of the original Carrier Third-Party Protocol is not a distinction that relates to a trade secret.  Eighth, StarTrak contends that the fact that Reefermatics only uses one-way communications compared to StarTrak's two-way communications is irrelevant because: (1) one-way solution is not commercially viable; (2) Satamatics admits it intends to provide two-way communications; and (3) a significant portion of the functionality and use of trade secrets involves processing information from the micro rather than sending commands to the micro.  (Pl.'s Reply 6-10).

Here, there is evidence to suggest that Hester and Shahzad did in fact use trade secrets obtained while employed with StarTrak to develop Satamatics' Reefermatics product.  However,

21

this being a highly technical field, the opinions of experts will be necessary to make that determination.[19]

Although the court finds that Plaintiff may likely succeed on the merits, Plaintiff has not established that it will suffer immediate irreparable harm or that Defendants would not suffer greater harm as a result of an injunction.  At the hearing, Mr. Chisholm testified that Satamatics would be harmed by a preliminary injunction in several ways.  Importantly, Mr. Chisholm testified that Satamatics has expended substantial effort in marketing, engineering, sales, and advertising of its Reefermatics product and that an injunction would exclude Satamatics from a global business opportunity in the reefer monitoring field.  (OSC Hr'g Tr. Vol. 2 104:8-104:20).  Additionally, Mr. Chisholm testified that an injunction would have a negative impact on its reputation in the industry.  (Id. at 105:4-105:12).

Moreover, Plaintiff has not shown that money damages would not fully compensate it for any damages that arise from Satamatics sale of its Reefermatics product or that those damages would not be ascertainable.  Clearly, any sales by Satamatics would be a matter of record on which damages could be readily computed.   Thus, in weighing the pertinent factors, Plaintiff's application must be denied.

### IV.  CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss and motion to strike will be denied, and Plaintiff's application for a preliminary injunction will be denied.  The court will

---

[19]For example, there was some testimony with respect to the "Requirements Specification" of the Reefermatics product.  However, as the court indicated at oral argument, expert testimony will be necessary to evaluate the significance of this document.  (OSC Hr'g Tr. Vol. 2 126:18-127:1).

enter an order implementing this opinion.


                                         /s/ Dickinson R. Debevoise
                                         DICKINSON R. DEBEVOISE, U.S.S.D.J.



Dated:          September 13, 2007